Filed 3/18/22  P. v. Scott CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>DELWUAN ORLANDO SCOTT et al.,<br><br>　　Defendants and Appellants. | B317191<br><br>(Kern County Super. Ct. No. BF165475) |

APPEAL from judgments of the Superior Court of Kern County, John R. Brownlee, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Manuel J. Baglanis, under appointment by the Court of Appeal, for Defendant and Appellant Delwuan Orlando Scott.

David Stanley, under appointment by the Court of Appeal, for Defendant and Appellant Malik Lequan Watson.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General,

Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendants Delwuan Orlando Scott and Malik Lequan Watson appeal from the judgment following their convictions for attempted murder, three counts of shooting at an occupied vehicle or inhabited dwelling, and two gang-related offenses. Scott also was convicted of evasion of a peace officer.

Defendants raise the following arguments on appeal:[1] (1) Scott's counsel was ineffective for failing to excuse from the jury a woman Scott claims was his high school guidance counselor, and the trial court erred by not inquiring further when Scott brought this to the court's attention; (2) the trial court failed to instruct the jury to view the statements of defendants' accomplice with caution; (3) the evidence supporting the gang findings was inadmissible hearsay; (4) the trial court incorrectly believed it lacked discretion under the "Three Strikes" law to impose Scott's sentences concurrently; (5) the convictions for shooting at an occupied vehicle or inhabited dwelling were statutorily ineligible for the firearm enhancement imposed by the trial court; (6) the matter must be remanded for the trial court to exercise its recently enacted discretion to strike the firearm enhancements; (7) Penal Code[2] section 654 barred punishment on some of the shooting offenses because they all arose from a single

_____

[1] The majority of the arguments are raised in Scott's appellate briefing, in which Watson expressly joins to the extent those arguments apply to him.

[2] Unspecified statutory citations are to the Penal Code.

2

objective; (8) the trial court improperly doubled the enhancements on Scott's sentence under the Three Strikes law; and (9) the errors cumulatively require reversal of the judgment.

We agree with defendants, as does the Attorney General, that the prosecution relied on hearsay to establish the predicate offenses underlying the gang findings, a procedure our Supreme Court recently rejected in *People v. Valencia* (2021) 11 Cal.5th 818. We thus reverse the gang-related convictions, penalties, and enhancements.

Among those gang-related penalties we must reverse are the life sentences imposed on the three counts of shooting at an occupied vehicle or inhabited dwelling. Absent these life sentences, those offenses are no longer statutorily eligible for the firearm enhancements imposed. We therefore reverse the firearm enhancements on those counts. As for the remaining firearm enhancements, during resentencing the trial court may exercise its discretion whether to strike them.

Finally, we agree that enhancements are not doubled under the Three Strikes law, and the trial court erred by doing so.

None of defendants' other arguments merits reversal or other relief. The record is insufficiently developed for us to conclude on direct appeal that counsel was ineffective for not taking further action regarding the juror Scott claims to have known. Nor can we conclude the trial court erred by failing to inquire further given that counsel did not press the issue. Any error in failing to instruct the jury on accomplice testimony was harmless given that other evidence corroborated the statements at issue. The record does not support Scott's contention that the trial court believed it lacked discretion under the Three Strikes law to sentence him concurrently. The multiple-victim exception

3

defeats defendants' argument under section 654.  We reject the argument that the errors cumulatively rendered the entire proceeding unfair.

Accordingly, we reverse the gang findings and related convictions, penalties, and enhancements, including the firearm enhancements on the convictions for shooting at an occupied vehicle or inhabited dwelling.  We remand for retrial of the gang allegations and the two gang-related offenses, or resentencing if the People choose not to proceed with retrial.  We otherwise affirm the judgments.

## FACTUAL BACKGROUND

We limit this summary to the facts relevant to the resolution of this appeal.

### 1.    *Shooting and investigation*

At about 1:00 a.m. on August 2, 2016, Filiberto O. was sitting in a vehicle in front of his home on H. Street[3] in Bakersfield.  An SUV drove past him.  Shortly thereafter, Filiberto O. heard gunshots and the back window of his vehicle shattered.  Filiberto O. saw a man standing near the rear of the SUV shooting at him.  Filiberto O. heard more than 10 gunshots, some of which struck his vehicle.  Filiberto O. fled the scene in his vehicle.

Filiberto O. drove to a liquor store.  He saw the SUV drive past again.  The SUV slowed down and Filiberto O. saw the occupants staring at him.  He recognized the person sitting in the

---

[3]  Because the victims in this case all live on the same street, for their privacy we conceal the full name of the street.

4

front passenger seat as the person who had shot at him. Filberto O. drove away.

Filiberto O. called 911 to report the shooting. Officer Braxton Tune of the Bakersfield Police Department[4] located the SUV and pursued it on a high-speed chase that lasted 13 minutes and covered 14 miles. During the chase, Tune saw the occupants of the SUV discard two items out of the windows.

The police finally were able to stop the SUV in a parking lot. Three of the SUV's occupants fled on foot. The driver and one passenger remained in the SUV.

Officer Nestor Barajas pursued two of the fleeing suspects, first in his vehicle and then on foot. Although the suspects managed to evade Barajas, he got within five feet of one suspect, and saw the other from about 20 feet away. That night, Barajas looked at booking and Facebook photos and identified Scott and Watson as the men he was chasing. He identified them again at trial.

Other officers apprehended the third fleeing suspect, identified as Demond Rufus. Police presented Rufus and the two suspects who remained in the SUV, Charles Mitchell and Mycal Deans, to Filiberto O. Filiberto O. identified Deans as the person he saw shooting at him.

An officer searched the area where Tune first saw the suspects discard an item from the SUV during the chase, and located a .40 caliber pistol.

The next day, Araceli T., who lived near the site of the shooting, showed police a hole in the wall of her home that was

---

[4] All police officers referred to in this Factual Background section worked for the Bakersfield Police Department.

5

not there before the date of the shooting. Another nearby resident, Maria V., found a bullet in her yard, and police found a bullet lodged in the tire of Maria V.'s vehicle.

Police obtained surveillance video from a gas station recorded at 12:16 a.m. on August 2, 2016, approximately 45 minutes before the shooting. The prosecution presented the video and a still frame from that video to the jury. The video is not in the record on appeal, but the prosecution in closing argument described it as showing defendants getting out of an SUV.

A criminalist from the Kern Regional Crime Laboratory analyzed 19 shell casings recovered from the scene of the shooting, and opined that the casings were fired from three or four different weapons.

## 2.     *Charles Mitchell's police interview*

Mitchell, one of the suspects from the SUV, testified at trial. He denied making various statements to police, and the prosecution impeached him by playing portions of Mitchell's police interview following his arrest.

In his interview, Mitchell stated the following: He was driving the SUV. Rufus, Mitchell's cousin, was in the front passenger seat. Mitchell knew two of the three passengers in back, Deans and defendant Scott. The others referred to the third passenger in back as "Baby Blue."

Mitchell denied being a gang member but said Scott was. He was "pretty sure" Scott was an Eastside Crip.

Mitchell drove to H. Street. The interviewer asked if the occupants of the SUV were looking for trouble or for a party, to which Mitchell responded, "Trouble." Mitchell denied knowing anyone was armed.

A car was following them.  Mitchell pulled over and the car went past.  Scott told Mitchell to stop, then Scott "started shooting" from inside the SUV.  Baby Blue got out of the car and also fired shots.  Mitchell then "took off."

When Officer Tune was in pursuit, Scott told Mitchell to "keep going."  Someone threw a gun out the window.  When the police stopped the SUV, Rufus, Scott, and Baby Blue got out and ran.  Mitchell and Deans stayed in the SUV.

## 3. *Gang evidence*

### a. **Prior police contacts**

Officer Michael Malley encountered Scott on July 23, 2014.  Malley asked Scott what "hood" he was from, and Scott said, "Spoonie G."  Malley took that statement to refer to the Spoonie G subset of the Eastside Crips.

Officer Frederick Martinez encountered Watson at Martin Luther King, Jr. Park on August 27, 2015.  Also present were Andrew Ward, Stanley Peterson, Montrice Maize, and Jeremiah Turner.  Martinez was familiar with Ward's tattoos, which indicated membership in the Eastside Crips and a subset of that gang, the Stroller Boys.

On October 26, 2015, Officer Ryan Clark stopped a vehicle driven by Mycal Deans.  Also in the vehicle were Sidney Walker, Kira Davis, Byron Grimes, and defendant Watson.  Clark observed Watson reaching towards the floorboard of the vehicle.  Clark searched the vehicle and found a loaded handgun.

On February 1, 2016, Clark encountered Scott.  Scott was with Deon Hodge and Darius Robinson.

7

Officer Nathan Poteete stopped a vehicle on June 18, 2016 occupied by Mikequell Carter, Michael Carter, Kira Davis, Calvin Peterson, and Mycal Deans.

Officer Frank McIntyre encountered Scott on July 11, 2016. McIntyre asked Scott if he was "still active with the Eastside." Scott said yes, but he did not "hang out like I used to" for fear of getting in trouble or being targeted as a gang member.

### b.     Gang expert's testimony

The prosecution called Officer Barajas as a gang expert. Barajas had been with the Bakersfield Police Department for three and a half years, and in the gang unit for about 18 months.

Barajas explained that the Eastside Crips have a rivalry with the other Crip gangs in Bakersfield, the Westside Crips and the Country Boy Crips. The rivalry between the Eastside Crips and the Country Boy Crips manifests as assaults, shootings, and murders. H. Street, where the shooting at issue in this case took place, is in "the heart" of Country Boy Crip territory.

The Spoonie G Crips are a subset of the Eastside Crips. Martin Luther King, Jr. Park "belongs to the Eastside Crips" and is "an iconic place for them."

Primary activities of the Eastside Crips include possession of firearms for defensive and offensive purposes, murder, robbery, assault with deadly weapons, assault on police officers, narcotics sales, burglaries, possession of stolen property, and auto theft. Barajas opined that the gang has an "ongoing pattern of criminal activity."

Barajas identified three crimes committed by other members of the Eastside Crips. The first was possession of a firearm and gang participation committed by Dontrell Blinks in 2015. Barajas was familiar with the case because he assisted on

8

it and spoke to the officers who handled the case. He opined Blinks was an Eastside Crip based on "statements and prior contacts," and the finding of guilt in that case.

The second was a firearm possession offense committed by David Colen in November 2012. Barajas was familiar with the case because he spoke to the officer who handled it and read the report. He opined Colen was an Eastside Crip "[b]ased on the totality of those circumstances of that case and statements obtained and the location of where it was and his prior contacts."

The third was a drug possession offense committed by Marlon Turner in November 2011. Barajas was familiar with that case by reading the report and speaking to the officer who handled it. He opined Turner was an Eastside Crip "[b]ased on the totality of the circumstances of that case, as well as statements and prior contacts he had."

Turning to the participants in the offenses at issue in the instant case, Barajas opined that Mitchell and Rufus were associates of the Eastside Crips, but not gang members. He opined that Deans was a member of the Eastside Crips based on Deans' tattoos, other cases Deans had been involved in, conversations Barajas had with other officers, and Deans' prior contacts with police. Barajas was "personally familiar" with Deans' tattoos, which he observed during a court hearing. Barajas stated that some of the individuals Officers Clark and Poteete testified they encountered with Deans were Eastside Crips members, which Barajas knew either from his own contacts with those individuals or from conversations with other gang officers or gang members.

Barajas also opined that Scott was an active member of the Eastside Crips, based on "general offense reports, as well as the

circumstances of this case, and some street checks that were completed by other officers." Barajas noted the testimony of Officers Clark, McIntyre, and Malley, including Scott's statement to McIntyre that he was an active member of the Eastside Crips, and his statement to Malley that he was part of Spoonie G.

Barajas opined that Watson was an active member of the Eastside Crips. Barajas based this opinion in part on the testimony of Officer Clark regarding contacting Watson along with Deans and others in a vehicle from which Clark recovered a loaded firearm. Also significant was Officer Martinez's testimony that he encountered Watson in Martin Luther King, Jr. Park with individuals known to be Eastside Crip members.

The prosecution presented a hypothetical scenario matching the circumstances of the shooting in the instant case, and asked whether the crimes in that hypothetical were committed for the benefit of, at the direction of, or in association with the Eastside Crips. Barajas opined that they were. In Barajas' view, gang associates and active gang members driving into rival gang territory with guns indicates "they're looking for somebody to shoot." The shooting would benefit the gang associates by elevating their status, and it would benefit the active gang members by "giving them more respect and giving the gang more respect. Not only that, the general public is now going to fear this gang even more so just by reading it in the news."

## PROCEDURAL HISTORY

The jury found both defendants guilty of premeditated and deliberate attempted murder (§§ 664/187, subd. (a), 189) (count 1), shooting at an occupied vehicle (§ 246) (count 2), two counts of shooting at an inhabited dwelling (§ 246) (counts 3 and

10

4), carrying a loaded firearm in public while a member of a criminal street gang (§ 25850, subd. (c)(3)) (count 5), and participating in a criminal street gang (§ 186.22, subd. (a)) (count 6).  The jury also found Scott guilty of recklessly evading a peace officer (Veh. Code, § 2800.2.) (count 7).[5]

The jury found true that both defendants had personally discharged firearms in committing counts 1 through 4 (§ 12022.53, subd. (c)), and had personally used firearms in committing counts 5 and 6 (§ 12022.5, subd. (a)).  The jury further found true that counts 1 through 4, and in Scott's case count 7, were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).

In a separate proceeding, the trial court found Scott had suffered a prior conviction subjecting him to enhancements and sentencing under the Three Strikes law (§§ 667, subds. (c)–(j), 1170.12).

On each of counts 2 through 4, the trial court sentenced Scott to 64 years to life, to be served consecutively.  These sentences each incorporated the prior strike, a firearm enhancement, a prior felony enhancement, and an alternate penalty based on the true findings on the gang allegations.  The trial court imposed an additional consecutive determinate sentence of 15 years for count 7, which included, inter alia, a four-year gang enhancement.  The trial court imposed but stayed sentence on counts 1, 5, and 6 pursuant to section 654.  Scott's total sentence therefore was 207 years to life.

---

[5] The prosecution argued that Scott encouraged Mitchell to evade the police and thus was culpable as an aider and abettor.

11

The trial court imposed consecutive sentences on Watson of 35 years to life on count 1, 25 years to life on count 3, and 25 years to life on count 4, all of which incorporated the firearm enhancements and alternate penalties based on the true findings on the gang allegations. The trial court imposed but stayed sentence on counts 2, 5, and 6. Watson's total sentence therefore was 85 years to life.

## DISCUSSION

### A. Scott Fails To Show Counsel Was Ineffective For Not Challenging a Juror, or That the Trial Court Erred By Not Further Investigating Scott's Claim That He Knew That Juror

Just before he was sentenced, Scott sent a letter to the trial court claiming he informed defense counsel during voir dire that he knew one of the jurors. On appeal, Scott contends defense counsel was ineffective for failing to excuse the juror or raise the issue with the trial court, and the trial court erred by not investigating further upon receipt of Scott's letter. Watson joins Scott's argument, contending the juror's familiarity with Scott prejudiced him as well. We reject these challenges.

#### 1. Proceedings below

During jury selection, the trial court asked Scott, Watson, and their attorneys to stand and face the prospective jurors. The trial court asked the prospective jurors if any of them recognized the attorneys or either defendant. None of the prospective jurors answered yes.

On the day Scott was scheduled to be sentenced, the trial court received a handwritten letter from Scott. In the letter,

12

Scott claimed that during jury selection he informed defense counsel that Juror No. 9 had been his counselor in high school. Scott said it was "beyond me" why "she never said she recognized me," and he also "ha[d] no idea why my attorney never brought it up or asked her." Scott wrote, "[The] reason I am bringing it up now is I told [defense counsel] to put it on record and file a motion for jury misconduct and he told me he couldn't. He told me it was too late and to wait for my appeal."

At the outset of the sentencing hearing, the trial court informed the parties about the letter, which defense counsel had not seen, and gave defense counsel an opportunity to review it. After defense counsel had read the letter, the trial court asked if the defense had anything else to present other than the letter and a previously filed sentencing brief. Defense counsel said, "I don't believe so." The trial court asked, "[A]ny legal cause why judgment should not now be imposed?" Defense counsel said, "No, Your Honor." The trial court then discussed some other matters and proceeded to sentencing.

### 2. Analysis

To demonstrate ineffective assistance of counsel, Scott " 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' [Citation.]" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.) "Usually, 'ineffective assistance [of counsel claims are] more appropriately decided in a habeas corpus proceeding.' [Citation.]" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) On direct appeal, "we may reverse 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there

13

simply could be no satisfactory explanation.' [Citations.]" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711 (*Arredondo*).)

We cannot conclude on the record before us that Scott's counsel was ineffective. Scott's arguments on appeal largely assume that everything he said in his letter to the trial court was true and accurate. We are unwilling to make such an assumption. Thus, one obvious " 'satisfactory explanation' " (*Arredondo, supra*, 8 Cal.5th at p. 711), for counsel's decision not to challenge Juror No. 9 is that, contrary to the assertions in Scott's letter, Scott never actually informed counsel during jury selection that he knew Juror No. 9. If Scott did not tell his counsel that he knew Juror No. 9, counsel certainly was not ineffective for failing to dismiss her.

It is also conceivable that, even if Scott informed counsel during jury selection that he knew Juror No. 9, counsel had reason to keep her on the jury, and may have explained this to Scott. For that matter, it is conceivable that Scott himself wanted to keep her on the jury, and raised the misconduct issue only after he was convicted. In short, the record in this direct appeal is insufficient for us to assess whether Scott's letter accurately describes what happened between him and his counsel, and if so, whether those events support a claim of ineffective assistance of counsel. That is a question appropriate for a habeas corpus proceeding after further development of the record.

Nor can we conclude that counsel was ineffective for not pressing the issue at sentencing once he had read Scott's letter. Failure to challenge a juror for cause or through peremptory challenges forfeits later argument that the juror was unacceptable. (See *People v. Taylor* (2010) 48 Cal.4th 574, 606;

14

*People v. Hart* (1999) 20 Cal.4th 546, 589.) If Scott waited until after the verdict to inform counsel and the trial court that he recognized one of the jurors during jury selection, he would have forfeited any challenge to that juror. Counsel cannot be ineffective for declining to raise a meritless argument.

Scott argues that defense counsel's failure to offer any explanation when presented with Scott's letter should be interpreted as an admission that defense counsel had no explanation, and Scott's letter was accurate. It is at least as plausible, however, that defense counsel did not wish to make his client look bad by challenging the veracity of the letter, and decided as a tactical matter to move on from the issue as quickly as possible. Again, the record is insufficient to eliminate the possibility that counsel had sound reasons for his conduct. Scott thus fails to meet his burden to establish ineffective assistance of counsel on direct appeal.

We further reject Scott's contention that the trial court erred by not inquiring further upon receipt of his letter. "As a general rule, parties who are represented in court by counsel of record are required to proceed in court through their counsel." (*In re Barnett* (2003) 31 Cal.4th 466, 471.) Having received an improper ex parte communication from Scott, the trial court properly presented it to defense counsel and invited further comment. Counsel stated there was no reason not to proceed with sentencing, indicating implicitly that in counsel's view, Scott's letter provided no basis for relief or further inquiry. The trial court was entitled to accept this implicit representation from an officer of the court charged with representing Scott's interests. It is not the trial court's duty to question counsel's tactical decisions.

15

Scott argues the trial court should have construed his letter as a *Marsden* or *Faretta* motion seeking to replace his counsel or represent himself.[6]  Motions regarding representation are exempt from the general rule that represented parties must proceed through counsel.  (*People v. Clark* (1992) 3 Cal.4th 41, 173, overruled on another ground as stated in *People v. Pearson* (2013) 56 Cal.4th 393, 462.)  "Such motions must be clearly labeled as such," however.  (*Clark*, at p. 173.)  Scott's letter was not labeled as a motion to replace counsel or represent himself, nor did it contain such a request.

## B.    Any Error In Failing To Instruct the Jury on Accomplice Testimony Was Harmless

Defendants argue that because Mitchell was an accomplice to the charged offenses, the trial court erred by not instructing the jury to view Mitchell's statements with caution and not accept them without corroboration.  We hold any error was harmless.

Section 1111 provides, in relevant part, "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense."  An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant . . . ."  (*Ibid*.)

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony.  [Citation.]  This includes

_____

[6] *People v. Marsden* (1970) 2 Cal.3d 118; *Faretta v. California* (1975) 422 U.S. 806.

16

instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence." (*People v. Houston* (2012) 54 Cal.4th 1186, 1223.) " '[T]estimony' includes an accomplice's out-of-court statements made under questioning by police or under other suspect circumstances.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 190.)

It is undisputed the trial court in the instant case did not instruct the jury on the principles of accomplice testimony. It is also beyond dispute that Mitchell's statements implicated Scott, whom Mitchell told police was a gang member who fired on another vehicle and then encouraged Mitchell to evade a pursuing officer.[7]

Assuming arguendo Mitchell was an accomplice and the trial court should have provided an instruction on accomplice testimony, we conclude any error in omitting that instruction was harmless. "Any error in failing to instruct the jury that it could not convict defendant on the testimony of an accomplice alone is harmless if there is evidence corroborating the accomplice's testimony. ' "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." ' [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 456 (*Williams*).) "The evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the

---

[7] Mitchell did not identify Watson by name. Given our conclusion any instructional error was harmless, we need not decide if Mitchell's statements to the police implicated Watson for purposes of section 1111.

17

truth.' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303 (*Gonzales & Soliz*).)

This standard is more forgiving than the harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836, "which requires reversal if, after an examination of the entire case, 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]" (*Gonzales & Soliz*, *supra*, 52 Cal.4th at p. 303.) The more stringent *Watson* harmless error analysis is required only in the absence of adequate corroboration. (See *Gonzales & Soliz*, at p. 304.)

Here, there was adequate evidence corroborating Mitchell's statements. Surveillance video presented to the jury showed defendants with the SUV 45 minutes before the shooting. Officer Barajas identified both defendants as the suspects he pursued following the shooting. The criminalist testified that three or four guns were used, which lends support to Mitchell's statements that Scott and Baby Blue both fired weapons.

Mitchell's statement that Scott was a gang member was corroborated by Scott's own statements to Officers McIntyre and Malley. Scott argues his statements to the police were inadmissible hearsay, but a defendant's own out-of-court statements are not barred by the hearsay rule when offered against him. (Evid. Code, § 1220; *People v. Gonzalez* (2021) 12 Cal.5th 367, 409.)

Scott argues that although there was corroborating evidence of multiple shooters, "no eyewitness, forensic, scientific, or ballistic evidence" established that Scott himself was a shooter. Assuming this is so, the law does not require that the corroborating evidence " ' "establish every element of the charged

18

offense" ' " (*Williams*, *supra*, 49 Cal.4th at p. 456), only that it " 'tend[ ] to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*Gonzales & Soliz*, *supra*, 52 Cal.4th at p. 303.) The evidence here satisfied that standard by establishing defendants were in the SUV shortly before and after the shooting, and multiple weapons were fired from the SUV.

## C. The Gang Findings Were Based on Inadmissible Hearsay

Defendants argue that Officer Barajas' testimony regarding prior crimes committed by Eastside Crip members was based on inadmissible hearsay, and thus the jury's gang findings must be reversed under *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*). The Attorney General agrees, as do we.

Defendants were convicted of two gang-related offenses— carrying a loaded firearm in public while a member of a criminal street gang (§ 25850, subd. (c)(3)), and participating in a criminal street gang (§ 186.22, subd. (a))—and also were subjected to alternate penalties and enhancements based on the jury's finding that they had committed the other charged offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).

To establish that the Eastside Crips were a "criminal street gang," as required by these offenses, penalties, and enhancements, the prosecution was required to prove, inter alia, that the members of that gang "collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) "A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' specified criminal offenses (the so-called 'predicate offenses') that are committed

19

within a certain time frame and 'on separate occasions, or by two or more persons.' [Citation.]" (*People v. Loeun* (1997) 17 Cal.4th 1, 4; see also § 186.22, subd. (e).)

In *Valencia*, the prosecution established the predicate offenses through the testimony of a gang expert whose "only knowledge of these offenses came from conversations with other officers and a review of police reports." (*Valencia*, *supra*, 11 Cal.5th at p. 827.) The Supreme Court held this was reversible error. (*Id.* at pp. 839–840.) The court held that predicate offense evidence "constitute[s] case-specific facts that must be proved by independently admissible evidence." (*Id.* at p. 839.) "[S]uch proof may not be established solely by the testimony of an expert who has no personal knowledge of facts otherwise necessary to satisfy the prosecution's burden." (*Id.* at p. 826, citing *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).) *Valencia* disapproved of Court of Appeal decisions holding that predicate offense evidence constituted background information to which an expert properly could testify, even if derived from hearsay. (*Valencia*, at pp. 831, 835, 839, fn. 17.)

In the instant case, as in *Valencia*, the prosecution established the required predicate offenses through the testimony of a gang expert, Officer Barajas. Barajas testified regarding three offenses purportedly committed by Eastside Crip members. As to two of those offenses, Barajas testified he knew of them based solely on conversations with the officers who handled them and by reading the reports. Under *Valencia*, this testimony was

20

inadmissible.[8]  The error was prejudicial, because there was no other evidence to establish those predicate offenses.

Accordingly, we must reverse the convictions on counts 5 and 6 and the true gang findings on counts 1 through 4 and 7. Consistent with the judgment of the Court of Appeal affirmed in *Valencia*, we remand for retrial on those counts and allegations, or should the People choose not to proceed with retrial, for resentencing.  (See *Valencia*, *supra*, 11 Cal.5th at p. 828, fn. 7.)

Scott argues the entire judgment should be reversed because "the gang-related allegations were used by the prosecution as significant bases to prove motive and intent for the commission of the charged offenses."  We disagree, because defendants' intent was established by admissible evidence.

Although a gang expert may not testify regarding case-specific facts unsupported by independently admissible evidence, the expert's "general testimony about a gang's behavior, history, territory, and general operations is usually admissible." (*Valencia*, *supra*, 11 Cal.5th at p. 838.)  Thus, whereas Barajas did not provide admissible testimony that the Eastside Crips met the technical definition of a "criminal street gang" for purposes of section 186.22, he provided admissible testimony that the Eastside Crips were a gang with a rivalry with another gang, the Country Boy Crips, and that rivalry historically manifested in

---

[8]  It is not clear how much of Barajas' testimony regarding the third offense was based on personal knowledge.  He testified he knew about that case both by assisting on it and by speaking with the officers handling it.  Regardless, even if he had personal knowledge as to that one offense, his testimony was insufficient to establish the commission of two predicate offenses, as required under section 186.22, subdivision (e).

21

shootings and assaults.  Also admissible was his testimony that the shooting took place in the heart of Country Boy Crips territory, and his opinion that gang members who drive into rival territory armed with guns are looking for someone to shoot.  This testimony was further bolstered by Mitchell's admission that he and the others drove to H. Street looking for "[t]rouble."

There also was admissible evidence that at least some of the individuals in the SUV, including Scott, were Eastside Crips. Two police officers testified that Scott had told them he was a member of the Eastside Crips or its subset Spoonie G, and Mitchell told police he was "pretty sure" Scott was an Eastside Crip.  Barajas opined that Deans was an Eastside Crip based on his tattoos, which Barajas personally had observed.  (See *Sanchez, supra*, 63 Cal.4th at pp. 677–678 [if presence of tattoo is established by a witness who observed it, expert may testify that the tattoo is a symbol adopted by a street gang, and that a person with that tattoo is a member of the gang].)  Indeed, Scott concedes admissible evidence established that Deans was a gang member with a "desire to shoot someone in Country Boy Crips' territory."

The evidence having established that Scott and Deans drove into Country Boys Crips territory looking for someone to shoot, it is inconceivable that the jury would not further conclude that Watson, whom Mitchell's statements indicated participated in the shooting,[9] shared in their intent.  This is so regardless of

---

[9]  Although Mitchell did not identify Watson by name, it is clear that Watson is the Baby Blue to whom Mitchell referred.  It is undisputed there were five occupants of the SUV, four of whom Mitchell identified by name—Rufus, Dean, Scott, and himself.

whether the other evidence of Watson's gang membership was admissible, an issue we do not decide.  We therefore conclude that reversal of the gang findings does not require reversal of the entire judgment.

In a letter sent to the court after briefing was completed, Watson asks us to consider the impact of amendments to section 186.22 enacted under Assembly Bill No. 333, which Watson contends require reversal of the gang findings.  Because we are reversing the gang findings under *Valencia*, it is unnecessary for us to determine if Assembly Bill No. 333 provides an alternative basis for reversal, and we decline to do so.

### D.     The Record Does Not Support Scott's Contention That the Trial Court Believed It Was Required To Impose Consecutive Sentences Under the Three Strikes Law

Scott contends the trial court sentenced him consecutively on counts 2 through 4 based on the incorrect conclusion that the Three Strikes law required it.  As we explain, the record does not support this contention; rather, the record indicates the trial court imposed consecutive sentences because the counts involved separate victims and separate acts of violence, bases unrelated to the Three Strikes law.

There is a split of authority as to whether "Proposition 36 eliminated the trial court's discretion to impose concurrent sentences on multiple current serious or violent felony

---

Thus, the man he identified as Baby Blue could only be Watson, the fifth occupant of the SUV as identified by the surveillance video and Officer Barajas.  Mitchell told the police that both Scott and Baby Blue were the shooters.

23

convictions" under the Three Strikes law. (See *People v. Henderson* (2020) 54 Cal.App.5th 612, 621 (*Henderson*), review granted Dec. 23, 2020, S265172.) The issue currently is pending before the Supreme Court. Scott urges us to adopt the position of courts holding that trial courts retain discretion to impose concurrent sentences even after Proposition 36.

We decline to enter this debate. In every published opinion in which a defendant has challenged consecutive sentences on the basis that the trial court misunderstood its discretion under the Three Strikes law, there was indication in the record that the trial court in fact believed the Three Strikes law mandated consecutive sentencing. (See *Henderson*, *supra*, 54 Cal.App.5th at p. 620 [trial court stated the " 'three strikes law requires that on serious or violent felonies, two or more, that they be sentenced consecutively' "]; *People v. Marcus* (2020) 45 Cal.App.5th 201, 208 [trial court "agreed" that it "lacked discretion to sentence defendant concurrently"]; *People v. Gangl* (2019) 42 Cal.App.5th 58, 64, fn. 6 ["trial counsel conceded that consecutive sentences were mandatory"]; *People v. Torres* (2018) 23 Cal.App.5th 185, 196 [Three Strikes statutes " 'mandate the full term consecutive sentences' "].) Thus, in each of these cases, the reviewing court appropriately considered whether the trial court misunderstood its discretion.

In contrast to the above cited cases, there is no indication in the instant case that the trial court believed the Three Strikes law mandated consecutive sentencing. Scott's probation report, on which the trial court appears to have based its sentencing decisions, states, "It is recommended Counts Two, Three and Four be served consecutively as the counts involved separate victims and separate acts or threats of violence." During

24

sentencing, the trial court similarly stated, "It's ordered as to Count 2, 3, and 4 be served consecutively as the counts involve separate victims and separate acts or threats of violence."

Nothing in the Three Strikes law refers to separate victims or separate acts of violence as a basis for consecutive sentencing. Rather, these are discretionary bases for imposing consecutive sentences unrelated to the Three Strikes law. (See *People v. Leon* (2010) 181 Cal.App.4th 452, 468 ["A trial court has discretion to impose consecutive sentences where . . . a single act has resulted in crimes against multiple victims."]; Cal. Rules of Court, rule 4.425(a)(2) [among the "[f]actors affecting the decision to impose consecutive rather than concurrent sentences" is "[t]he crimes involved separate acts of violence or threats of violence"].) Had the trial court believed it was required under the Three Strikes law to impose consecutive sentences, it would have no reason to cite these other bases. Rather, it would have invoked the Three Strikes law, which it did not do, nor did the probation report or the prosecution. Thus, the record makes clear the trial court did not look to the Three Strikes law in imposing consecutive sentences.

In arguing to the contrary, Scott refers to the trial court's statement at the outset of sentencing that the court "doesn't take any pride or satisfaction in sentencing a 22-year-old man to the sentence that the law requires today. I don't like doing it, but the fact of the matter is the law in the State of California requires it. Whether I like it or not, that is my job, that's what I have to do, and the law requires that." Nothing in this statement refers to the Three Strikes law or suggests the trial court imposed consecutive sentences on that basis, particularly when the trial

25

court expressly cited separate, non-Three Strikes bases to impose consecutive sentences.

In the absence of a record indicating the trial court imposed consecutive sentences because it believed the Three Strikes law mandated it, Scott's argument on this point fails. Nevertheless, we recognize that general statements that the law "requires" a particular sentence, as the trial court stated at the outset of sentencing in this case, can create ambiguity as to when the trial court was exercising its discretion and when the trial court believed a particular aspect of the sentence was mandatory. Given that we are vacating defendants' sentences for other reasons, we ask, should the trial court on remand again impose consecutive sentences, that the trial court make clear on the record whether it is doing so as a matter of discretion. This will assist us should there be further appellate review of this case.

**E.    Reversal of the Gang Findings Requires Reversal of the Firearm Enhancements Under Section 12022.53, Subdivision (C) on Counts 2 Through 4**

Watson argues counts 2 through 4, the counts for shooting at an occupied vehicle or inhabited dwelling, are statutorily ineligible for the firearm enhancement under section 12022.53, subdivision (c). We conclude our reversal of the gang findings requires reversal of the firearm enhancements as well.

The 20-year enhancement under section 12022.53, subdivision (c) applies only to felonies specifically enumerated in subdivision (a) of that statute. (See § 12022.53, subd. (c).) Among the enumerated felonies is "[a]ny felony punishable by death or imprisonment in the state prison for life." (*Id.*, subd. (a)(17).)

26

Section 246, the offense underlying counts 2 through 4 in the instant case, normally is not subject to an enhancement under section 12022.53, subdivision (c), because it is neither an expressly listed offense nor an offense punishable by death or life imprisonment.  (See §§ 246 [punishable by imprisonment for three, five, or seven years]; 12022.53, subd. (a).)

As our Supreme Court held in *People v. Jones* (2009) 47 Cal.4th 566, however, an offense under section 246 *is* subject to a section 12022.53, subdivision (c) enhancement when committed for the benefit of, at the direction of, or in association with a criminal street gang.  (*Jones*, at pp. 568–569, 572.)  This is because the true gang findings increase the penalty for a section 246 conviction to a life sentence.  (§ 186.22, subd. (b)(4)(B); *Jones*, at p. 572.)  That life sentence, in turn, renders the section 246 conviction eligible for the section 12022.53, subdivision (c) enhancement as a "felony punishable by . . . imprisonment in the state prison for life."  (§ 12022.53, subd. (a)(17); *Jones*, at p. 569.)

Thus, were the gang findings valid in this case, defendants would be subject to 20-year firearm enhancements on counts 2 through 4.  Given that we are reversing the gang findings under *Valencia*, however, and therefore reversing the life sentences imposed under section 186.22, subdivision (b)(4)(B), we must also reverse the firearm enhancements under section 12022.53, subdivision (c) on counts 2 through 4.  Should the People choose to retry the gang allegations and the jury finds them true, the trial court may again impose the firearm enhancements on counts 2 through 4, subject to its discretion as discussed in part F, *post*.

Our holding does not affect the section 12022.53, subdivision (c) enhancement on count 1, attempted murder, and

27

Watson does not contend otherwise. (See § 12022.53, subd. (a)(1), (18) [listing attempted murder as an enumerated felony subject to the 20-year enhancement].)

## F. On Remand, the Trial Court May Exercise Its Discretion Whether To Strike the Remaining Firearm Enhancements

Subsequent to sentencing in the instant case, Senate Bill No. 620 amended sections 12022.5 and 12022.53 to grant trial courts previously unavailable discretion to strike firearm enhancements in the interest of justice. (*People v. Baltazar* (2020) 57 Cal.App.5th 334, 337.) These amendments apply retroactively to the instant case, in which judgment is not yet final. (See *ibid.*) Defendants request that we remand so the trial court may exercise its discretion whether to strike the firearm enhancements. The Attorney General agrees remand is appropriate.

As we have explained, we are reversing the enhancements under 12022.53, subdivision (c) applied to counts 2 through 4. We are also reversing the gang-related convictions, counts 5 and 6, the counts to which the trial court applied enhancements under section 12022.5, subdivision (a). The only firearm enhancements remaining are the section 12022.53, subdivision (c) enhancements applied to defendants' sentences on count 1, attempted murder. During resentencing, the trial court may exercise its discretion whether to strike those enhancements. Also, should the reversed firearm enhancements again be at issue following retrial, the trial court may exercise its discretion as to those enhancements as well.

## G. Section 654 Does Not Bar Punishment For Counts 3 and 4

"Section 654 'generally precludes multiple punishments for a single physical act that violates different provisions of law [citation] as well as multiple punishments for an indivisible course of conduct that violates more than one criminal statute.' [Citations.] ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." ' [Citation.]" (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 94, italics & fn. omitted.)

Scott argues that the sole intent and objective of the shooting was to hit Filiberto O., with no separate objective to shoot at the two inhabited dwellings, the acts underlying counts 3 and 4. He contends, therefore, that section 654 barred the punishments for counts 3 and 4.

Scott is incorrect. "[S]ection 654 does not apply to crimes of violence against multiple victims. [Citation.] The reason is that ' "[a] defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person." ' [Citation.]" (*People v. Correa* (2012) 54 Cal.4th 331, 341, fn. omitted (*Correa*).) The multiple-victim exception "allows separate punishment for each crime of violence against a different victim, even though all crimes are part of an indivisible course of conduct with a single principal objective." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1630–1631.)

29

Firing multiple shots in a residential neighborhood is " ' "an act of violence . . . likely to cause harm to several persons . . . ." ' [Citation.]" (*Correa*, *supra*, 54 Cal.4th at p. 341.) In doing so, Scott and Watson endangered multiple victims, including Filiberto O. and the residents of Araceli T.'s and Maria V.'s homes. The multiple-victim exception applies, and there was no basis to stay the sentences on counts 3 and 4 under section 654.

## H. The Trial Court Improperly Doubled the Enhancements on Scott's Sentence

In sentencing Scott on counts 2 through 4, the trial court not only doubled the base term pursuant to the Three Strikes law (see §§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), but also doubled the enhancements. As the Attorney General concedes, this was error. When a defendant has one prior strike conviction, "enhancements are added after the determination of the base term and are not doubled." (*People v. Sok* (2010) 181 Cal.App.4th 88, 93.) Should the trial court impose enhancements during resentencing, we direct the trial court to observe this rule.

## I. Cumulative Error Does Not Merit Reversal

Scott argues the errors below in the aggregate rendered his trial unfair and require reversal of the judgment. We have explained why the errors regarding the gang evidence do not justify reversing the entire judgment, and the other errors are technical matters involving sentencing that are easily corrected. We are satisfied our disposition addresses all errors without need for reversal of the full judgment.

30

# DISPOSITION

As to Delwuan Orlando Scott, we reverse the convictions on counts 5 and 6, the true findings, penalties, and enhancements on counts 1, 2, 3, 4, and 7 under Penal Code section 186.22, and the enhancements on counts 2, 3, and 4 under Penal Code section 12022.53, subdivision (c). Scott's sentence is vacated. The judgment otherwise is affirmed.

As to Malik Lequan Watson, we reverse the convictions on counts 5 and 6, the true findings, penalties, and enhancements on counts 1, 2, 3, and 4 under Penal Code section 186.22, and the enhancements on counts 2, 3, and 4 under Penal Code section 12022.53, subdivision (c). Watson's sentence is vacated. The judgment otherwise is affirmed.

The matter is remanded to the trial court with directions to allow the People to retry defendants on counts 5 and 6 and the allegations under Penal Code section 186.22. Following retrial, or if the People elect not to proceed with retrial, the trial court shall resentence defendants, consistent with this opinion, and send new abstracts of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.

                                            BENDIX, J.

We concur:


ROTHSCHILD, P. J.                CRANDALL, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31